IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KANSAS, STATE OF, et al., | |
| **Plaintiffs,** | |
| **v.** | **Case No. 2:20-cv-02386-HLT-GEB** |
| UNITED STATES DEPARTMENT OF INTERIOR, et al., | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

This is an Administrative Procedures Act ("APA") case brought by Plaintiffs, who are governmental entities in Kansas and two Indian Tribes. They are appealing the Secretary of the Department of the Interior's ("Secretary") final agency decision to acquire property in trust by the United States for the benefit of the Wyandotte Nation, an Indian tribe that is not a party to this case, and her decision that the Wyandotte Nation may conduct gaming on the land. Plaintiffs[1] move for a preliminary injunction enjoining the Secretary's decision regarding gaming. Doc. 13. Because Plaintiffs have not demonstrated a likelihood of success on the merits or a showing of irreparable harm, the Court denies the motion.

## I.    BACKGROUND[2]

This case challenges the Secretary's final agency decision issued on May 20, 2020. But this dispute extends back nearly 30 years and involves related litigation spanning more than a

---

[1]  The preliminary-injunction motion was filed by Plaintiffs State of Kansas, Board of County Commissioners of the County of Sumner, Kansas, and the City of Mulvane, Kansas. Plaintiff Iowa Tribe of Kansas and Nebraska has joined in the motion. Doc. 18. Plaintiff Sac and Fox Nation of Missouri in Kansas and Nebraska has not.

[2]  The following facts are alleged in the complaint, its exhibits, and in the exhibits submitted with the preliminary-injunction motion. Although the complaint is not verified, Plaintiffs submitted an affidavit of Keith Kocher, the Director of Gaming Facilities of the Kansas Lottery, verifying that the factual allegations in the complaint are true. *See* Doc. 14-2. The Court has also reviewed the extensive related caselaw.

decade. *See Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1249 (10th Cir. 2006) ("This long battle has produced a procedural history as complex as a random maze."). The following is not intended to be a comprehensive summary of the disputes between the Wyandotte Nation and federal, state, and local authorities. Rather, the Court has endeavored to provide relevant context for the current motion.

### A.       Wyandotte Nation Land Disputes and PL 602

Beginning in the 1700s, the Wyandot (now known and referred to here as the "Wyandotte Nation") were relocated and removed several times from Canada, Michigan, Ohio, and Kansas. In 1855, they were finally moved to Oklahoma. Many of these moves involved treaties in which the Wyandotte Nation ceded or relinquished land to the United States.

In the 1970s, the Wyandotte Nation brought four claims before the Indian Claims Commission ("ICC") seeking compensation for the land ceded under those treaties. These claims resulted in money judgments against the United States and in favor of the Wyandotte Nation.

In 1984, Congress passed a bill—referred to here as PL 602—"to provide for the use and distribution of certain funds awarded the Wyandotte Tribe of Oklahoma." PL 602 provided for the distribution of approximately $4.7 million awarded as part of the ICC claims. Eighty percent of the money went to individual members of the Wyandotte Nation. The remaining 20%—approximately $939,000—was allocated to the Wyandotte Nation itself, with the caveat that $100,000 of those funds were to "be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of [the Wyandotte Nation]." This is known as the "mandatory trust" provision of PL 602. The use of that $100,000—referred to here at the "PL 602 funds"—has been at the heart of decades of litigation and is still at issue here.

### B.      Land Purchases by the Wyandotte Nation

The Wyandotte Nation initially held the PL 602 funds separately from its general fund and invested the PL 602 funds in mortgage bonds in the late 1980s. But in 1991, the Wyandotte Nation merged its PL 602 funds with its general fund. Because purchases made with PL 602 funds carry mandatory trust obligations, tracing the PL 602 funds and their use after the merger has, and still is, a source of dispute between the parties.

#### 1.      Park City Parcel

In 1992, the Wyandotte Nation purchased the Park City Parcel of land for $25,000. The Park City Parcel is approximately 10 acres of land near Park City in Sedgwick County, Kansas. Shortly after purchasing the Park City Parcel, the Wyandotte Nation sought trust status for it, but they later withdrew that application. The Park City Parcel, as discussed further below, is the subject of this litigation.

#### 2.      Shriner Tract Litigation

In 1996, the Wyandotte Nation purchased the Shriner Tract, a piece of land in Kansas City, Kansas, for $180,000, using PL 602 funds. The purchase of the Shriner Tract and the Wyandotte Nation's desire to game on it spawned 14 years of litigation, spanning multiple cases and involving at least four trips to the Tenth Circuit. Although the Shriner Tract is not the focus of this case, its purchase and the related litigation are relevant to Plaintiffs' claim, which, highly summarized, is that the PL 602 funds could not be used to purchase both the Shriner Tract and the Park City Parcel.

##### a.      Shriner Tract Trust Acquisition

After acquiring the Shriner Tract, the Wyandotte Nation requested that it be taken into trust under PL 602. After an initial decision to take the Shiner Tract into trust by the Secretary, the state

and other tribes sued the Secretary to stop the acquisition. Several rulings in that litigation are relevant in this case.

After some initial rulings by the district court, the Tenth Circuit held that the Secretary is required to take land bought with PL 602 funds into trust for the Wyandotte Nation. *See Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1262 (10th Cir. 2001). Although the decision to take land into trust for the benefit of an Indian tribe is generally discretionary under federal law, PL 602's plain language that land purchased with PL 602 funds "shall be held in trust by the Secretary for the benefit of [the Wyandotte Nation]" leaves the Secretary no discretion. *Id.*[3]

After the Secretary confirmed that PL 602 funds were used to purchase the Shriner Tract, the state and other tribes again challenged that decision. *See Governor of Kansas v. Norton*, 430 F. Supp. 2d 1204, 1207 (D. Kan. 2006).[4] The district court affirmed the Secretary's decision. In doing so, the court upheld the Secretary's determination that PL 602 allowed the Wyandotte Nation to use both interest and investment income earned on the $100,000 originally earmarked for land acquisition under PL 602's mandatory-trust provision. *Id.* at 1220-21.

### b.      Shriner Tract Gaming Decision

While these cases were ongoing, the National Indian Gaming Commission ("NIGC") issued a decision that the Wyandotte Nation could not lawfully conduct gaming on the Shriner

---

[3]   However, because the Tenth Circuit was unable to determine whether the Shriner Tract was purchased with PL 602 funds, it remanded the case back to the agency to consider that question. *Sac & Fox Nation*, 240 F.3d at 1263-64. The Tenth Circuit also held that the Wyandotte Nation was not an indispensable party to the case. *Id.* at 1258-60.

[4]   For reasons not relevant here, the Shriner Tract litigation spanned several different and procedurally distinct cases. The substantive challenges to the Shriner Tract decision were ultimately dismissed for lack of subject-matter jurisdiction because there had been no waiver of sovereign immunity. *See Governor of Kansas v. Kempthorne*, 516 F.3d 833, 846 (10th Cir. 2008); *Iowa Tribe of Kan. and Neb. v. Salazar*, 607 F.3d 1225, 1228 (10th Cir. 2010). The Supreme Court has since held that the APA provides a waiver of sovereign immunity against the United States for suits challenging a decision to take land into trust for an Indian tribe. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Tract. The Wyandotte Nation appealed that decision to federal court. *See Wyandotte Nation v. Nat'l Indian Gaming Comm'n*, 437 F. Supp. 2d 1193, 1196 (D. Kan. 2006). Among the issues in that case was whether the Shriner Tract was eligible for gaming under the "settlement of a land claim" exception to the Indian Gaming Regulatory Act ("IGRA"). *Id.* at 1207-12.

IGRA, 25 U.S.C. §§ 2701-2721, was enacted to regulate Indian gaming. *Wyandotte Nation*, 437 F. Supp. 2d at 1199. IGRA's purpose was "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2502(1). IGRA also established the NIGC. *Id.* at § 2504. IGRA generally prohibits gaming on lands acquired in trust by the United States for the benefit of an Indian tribe after October 17, 1988. *Id.* at § 2719(a). There are some exceptions to that general rule. Relevant here is the exception that gaming is permitted on lands taken into trust as part of a "settlement of a land claim." *Id.* at § 2719(b)(1)(B)(i). If an exception does not apply, gaming is permitted only after consultation with the Secretary, the tribe, nearby tribes, and state and local officials, and if the governor of the state in question agrees that gaming is in the best interest of all involved. *Id.* at § 2719(b)(1)(A).

The court in *Wyandotte Nation* ultimately concluded that the Shiner Tract qualified for gaming under the "settlement of a land claim" exception. *Wyandotte Nation*, 437 F. Supp. 2d at 1210. Specifically, the court found that the claims paid in PL 602 were "land claims" within the meaning of IGRA. *Id.* at 1207-09. The court concluded that the "plain meaning" of "land claim" is not limited to a claim "for the return of land, but rather, includes an assertion of an existing right to the land." *Id.* at 1208. This included the claims brought before the ICC that gave rise to PL 602 and its mandate that $100,000 be used to purchase land to be taken into trust. *See id.* Accordingly,

*Wyandotte Nation* ultimately held that because the Shriner Tract was purchased with PL 602 funds, it qualified for IGRA's "settlement of a land claim" exception. *Id.* at 1210.

### C.      Trust Acquisition of the Park City Parcel

As noted above, the Wyandotte Nation purchased the Park City Parcel in 1992 (before it purchased the Shriner Tract) for approximately $25,000. Although the Wyandotte Nation initially sought trust status for the Park City Parcel, that application was withdrawn after the Shriner Tract litigation began to unfold. In 2008, the Wyandotte Nation resubmitted a trust application for the Secretary to acquire the Park City Parcel in trust, based on the assertion that the land was, like the Shriner Tract, purchased with PL 602 funds.

The dispute over the Park City Parcel focused on whether the PL 602 funds plus interest were sufficient to purchase both the Park City Parcel and the Shriner Tract. A report prepared by an auditing firm hired by the Wyandotte Nation originally suggested there were sufficient PL 602 funds plus interest to purchase both properties. But a subsequent report submitted by the state found that the earlier report failed to account for certain deductions and that, as a result, there were not enough PL 602 funds for both properties. The state's report noted that certain relevant financial records were missing, however.

On July 3, 2014, the Secretary denied the Wyandotte Nation's request to acquire the Park City Parcel in trust because the record at the time suggested that the Park City Parcel could not have been purchased with PL 602 funds alone because there would not have been enough to buy both it and the Shriner Tract.[5] *See* Doc. 1-1. But the Secretary did leave open the possibility that the Wyandotte Nation could submit a new application if it located the missing financial records.

---

[5]    At the time of the 2014 denial on the Park City Parcel, the Secretary acknowledged that it was already settled that the Shriner Tract had been purchased with PL 602 funds (plus interest). Thus, even though the Park City Parcel was purchased before the Shriner Tract, the Park City Parcel's trust status turned on whether there were sufficient PL 602 funds (plus interest) to purchase both properties. Doc. 1-1 at 9.

D.      May 20, 2020 Agency Decision

The Wyandotte Nation submitted a new application in 2017. With that new application, the Wyandotte Nation submitted audit reports and an updated accounting report addressing the accounting deficiencies that led to the 2014 denial. The Secretary issued a final decision on the 2017 application on May 20, 2020 (the "May 20 Decision"). *See* Doc. 1-2. The May 20 Decision— the decision at issue here—recited the general history of the Wyandotte Nation, PL 602, and the purchases of the Park City Parcel and the Shriner Tract. It noted the history of the Shriner Tract litigation and referenced holdings in the cases that were relevant to the Park City Parcel.

Based on that updated financial information submitted by the Wyandotte Nation, which was reviewed by the agency's Office of Financial Management, the Secretary concluded that PL 602 funds generated enough income or interest to cover the purchases of both the Park City Parcel in 1992 and the Shriner Tract in 1996. Based on the holding of the Tenth Circuit in *Sac & Fox Nation*, the Secretary acknowledged that the United States was therefore required to take the Park City Parcel into trust because it was purchased with PL 602 funds. This is referred to here as the "trust decision" in the May 20 Decision.

The May 20 Decision also addressed the eligibility of the Park City Parcel for gaming (the "gaming decision"). Having determined that the Park City Parcel was acquired with PL 602 funds, the Secretary determined "that the [Wyandotte] Nation may conduct gaming pursuant to the 'settlement of a land claim' exception to Section 2719 of IGRA . . . consistent with the Department's acquisition of the Shriner Tract as upheld by the court in 2006 in *Wyandotte Nation v. [T]he National Indian Gaming Commission*." Doc. 1-2 at 11.

The Wyandotte Nation has since apparently already opened a temporary gaming facility in a trailer on the Park City Parcel and have intentions to open a larger 500-machine temporary

gaming facility in November 2020 and a permanent casino with between 800-1200 machines that will be constructed beginning in 2021.

### E.      2008 Regulations

Finally, relevant to this dispute is the Department of the Interior's 2008 promulgation of regulations addressing IGRA's "settlement of a land claim" exception. The 2008 regulations included a regulation defining "Land claim," *see* 25 C.F.R. § 292.2, and a regulation setting forth "criteria for meeting the requirements of 25 U.S.C. [§] 2719(b)(1)(B)(i), known as the 'settlement of a land claim' exception," 25 C.F.R. § 292.5. The May 20 Decision did not address or apply these regulations.[6]

Following the May 20 Decision, Plaintiffs filed this lawsuit challenging both the trust decision and the gaming decision. They now seek a preliminary injunction enjoining the gaming decision only. Plaintiffs contend the gaming decision was arbitrary and capricious because it wrongly relied on the decision in *Wyandotte Nation* instead of the 2008 regulations in concluding that the Park City Parcel met the "settlement of a land claim" exception.

## II.      STANDARD

A party seeking a preliminary injunction must show that there is a substantial likelihood of success on the merits of the underlying claim, irreparable harm will occur unless the injunction is issued, the threatened injury outweighs any potential harm that the injunction may cause to the opposing party, and the injunction, if issued, will not adversely affect the public interest. *New*

---

[6]   The Wyandotte Nation applied for trust status for the Park City Parcel before these regulations were enacted, but the final agency decision was issued after. A separate regulation states that "[t]hese regulations apply to final agency action taken after the effective date of these regulations except that these regulations shall not apply to applicable agency actions when, before the effective date of these regulations, the Department or the National Indian Gaming Commission (NIGC) issued a written opinion regarding the applicability of 25 U.S.C. [§] 2719 for land to be used for a particular gaming establishment, provided that the Department or the NIGC retains full discretion to qualify, withdraw or modify such opinions." 25 C.F.R. § 292.26. Although the parties dispute whether it was improper for the Secretary not to consider these regulations, neither party argues that they were inapplicable to the May 20 Decision because of the timing of their enactment.

*Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1246 (10th

Cir. 2017). A preliminary injunction is "an extraordinary remedy." *Id.* at 1245-46 (quoting *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Whether to issue an injunction is within the

discretion of the court. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

Injunctions that alter the status quo are disfavored and require a heightened showing. *O*

*Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004)

(en banc). The Court finds that the requested injunction alters the status quo. The requested

injunction would enjoin a gaming decision that has already been made and could presumably

impact the Wyandotte Nation's currently ongoing gaming operations on the Park City Parcel.

Accordingly, Plaintiffs must make a "strong showing" of the injunction factors, particularly on the

likelihood-of-success and balance-of-the-harms factors. *Free the Nipple-Fort Collins v. City of*

*Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019).

## III.   ANALYSIS

Plaintiffs' preliminary-injunction motion only challenges the gaming decision, namely that

the Park City Parcel is eligible for gaming under the "settlement of a land claim" exception based

on the holding of *Wyandotte Nation*.[7] Accordingly, Plaintiffs must meet the preliminary-injunction

standard as to that decision. Although the underlying case also challenges the trust decision,

Plaintiffs do no seek any injunctive relief from that portion of the May 20 Decision. *See* Doc. 14

---

[7]   The Court notes Defendants' argument that no "gaming decision" was made, and that the Secretary was instead
only acknowledging the legal consequences of the trust decision. Doc. 19 at 23-24. Although the interplay of the
May 20 Decision and the role of the NIGC is an issue that will need to be addressed in the substantive briefing, for
purposes of the preliminary-injunction motion, the Court finds that May 20 Decision clearly includes a
determination that the Wyandotte Nation may conduct gaming on the Park City Parcel. *See* Doc. 1-2 at 11
("Following the determination that the Nation purchased the [P]ark City Parcel with Land Acquisition Funds, I
now determine that the Nation may conduct gaming pursuant to the 'settlement of a land claim' exception to
Section 2719 of IGRA.").

at 2. Accordingly, whether the Park City Parcel was, in fact, purchased with PL 602 funds (the crux of the trust decision) is not currently at issue.

### A.    Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits for the requested injunction, Plaintiffs must make a strong showing that they are substantially likely to succeed on their APA challenge to the gaming decision. *See Kansas*, 249 F.3d at 1228. "A federal court may not set aside an agency decision unless that decision fails to meet statutory, procedural or constitutional requirements, or is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (citing 5 U.S.C. § 706(2)(A)-(D)).

Plaintiffs' challenge of the gaming decision turns on whether it was proper for the Secretary to base the gaming decision on the *Wyandotte Nation* case that found that PL 602 funds qualified as "settlement of a land claim" funds. Plaintiffs contend it was not proper because the Secretary should have considered and applied the 2008 regulations addressing that exception. Plaintiffs argue that they are likely to succeed in their challenge to the gaming decision because the Secretary's reliance on *Wyandotte Nation* was not reasoned decision-making because (1) that case is factually distinct and (2) it is arbitrary and capricious for an agency to not comply with its own regulations.

### 1.    Factual Differences from *Wyandotte Nation*

Plaintiffs argue that the Secretary's reliance on *Wyandotte Nation* was "clearly wrong" because there are material factual differences between the purchase of the Shriner Tract and the purchase of the Park City Parcel, and those differences were material to the decision in *Wyandotte Nation*, making that decision inapplicable. Doc. 14 at 29. Plaintiffs contend that the holding in *Wyandotte Nation* turned on the fact that the Shriner Tract was purchased with "all" the PL 602 funds, and that had the Shriner Tract been purchased with funds over which the Wyandotte Nation

exercised discretion, the court would not have concluded the "settlement of a land claim" exception applied. Plaintiffs assert that the funds used to purchase the Park City Parcel were funds over which the Wyandotte Nation had such discretion.

This argument does not demonstrate a substantial likelihood of success on the challenge to the gaming decision. First, it assumes that there were insufficient PL 602 funds to purchase both the Park City Parcel and the Shriner Tract. The May 20 Decision found precisely the opposite. Plaintiffs may disagree, but that goes to the trust decision, not the gaming decision. Plaintiffs have made clear they are not attacking the trust decision in the preliminary-injunction motion, and they are therefore not entitled to a presumption that it was in error at this stage.

Second, the Court is not persuaded by Plaintiffs' reading of *Wyandotte Nation*. Although that decision noted that the "settlement of a land claim" exception might not apply to land purchased with an ordinary ICC money judgment, the decision distinguished that scenario from purchases made with PL 602 funds. Because the May 20 Decision found that the Park City Parcel was purchased with PL 602 funds, there is no factual distinction to be drawn.

### 2.    Failure to Consider Regulations

Plaintiffs also argue they are likely to succeed on their challenge to the gaming decision because the Secretary acted arbitrarily and capriciously by failing to comply with the regulations, instead relying on the decision in *Wyandotte Nation*. In their memorandum in support of their preliminary-injunction motion, Plaintiffs cite some cases suggesting it is arbitrary and capricious for an agency to not comply with its own regulations. The Court has reviewed those cases. Although those cases recite the general rule that an agency is required to follow its own regulations, none of them address the situation in this case, which is the applicability of a prior court decision directly on point versus later-enacted regulations. *See, e.g.*, *Cherokee Nation of Okla. v. Norton*,

389 F.3d 1074, 1084-87 (10th Cir. 2004) (reversing agency decision where agency not only failed to follow its own regulations but also issued a decision contrary to Supreme Court precedent); *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002) (finding agency failed to follow regulations without rational explanation).

Plaintiffs also argue that the Secretary failed to provide any logical or rational explanation for its "blind reliance" on *Wyandotte Nation* instead of the 2008 regulations. The APA requires an agency to articulate a satisfactory explanation for its action. *Kansas*, 249 F.3d at 1228-29. But for purposes of evaluating the preliminary-injunction motion, which requires a strong showing of a substantial likelihood of success, the Court cannot conclude at this stage that the agency irrationally or without explanation relied on *Wyandotte Nation*. That case squarely addressed whether land purchased with PL 602 funds was eligible for gaming under the "settlement of a land claim" exception—the exact issue before the agency. Its relevance on this point was noted in the May 20 Decision and otherwise seems apparent.

In their reply brief, Plaintiffs make a more nuanced argument. Plaintiffs argue that, because *Wyandotte Nation* only construed the "plain meaning" of the term "land claim," and not the full statutory exception of "settlement of land claim," *Wyandotte Nation* did not conclude that the entire statutory exception was unambiguous. Doc. 21 at 20. Because of this, the Department of the Interior was entitled to promulgate "gap-filling, definitional criteria" to guide application of the "settlement of land claim" exception, and the Secretary was required to follow those regulations regarding the Park City Parcel. *Id.* at 16-20.

The Court notes that arguments made for the first time in a reply brief are generally not proper because doing so deprives the Court of adequate briefing on the issue. However, the Court

agrees that whether an agency can rely on a court decision instead of later-enacted regulations seems to be the fundamental question surrounding the gaming decision.

Agency interpretation of statutes is generally governed by *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Where statutory language is clear, the unambiguously expressed intent of Congress must control, for both courts and agencies. But if a statute is silent or ambiguous, courts will generally defer to an agency's interpretation if it is based on a permissible construction of the statute. *Sac & Fox Nation*, 240 F.3d at 1260-61. However, the Supreme Court has held that "prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005).

Here, *Wyandotte Nation* addressed the "settlement of a land claim" exception under IGRA. The court held:

> The plain meaning of "land claim" does not limit such claim to one for the return of land, but rather, includes an assertion of an existing right to the land. As the Tribe points out, the word "land" modifies the word "claim," not "settlement," and thus a "land claim" means that the operative facts giving rise to a right arise from a dispute over land, not that the land claim be resolved by the return of land. Thus, the plain language of section 2719(b)(1)(B)(i) does not preclude the land claim brought before the ICC in this case from falling within that exception. By interpreting the term "land claim" as limited to claims for the return of land, the NIGC failed to give the words of section 2719(b)(1)(B)(i) "their ordinary, contemporary, common meaning."

*Wyandotte Nation*, 437 F. Supp. 2d at 1208. Plaintiffs argue that this only declared "land claim" to be unambiguous, but not the entire statutory phrase "settlement of a land claim," and therefore the 2008 regulation addressing that term—25 C.F.R. § 292.5—must control, and the Secretary erred in not applying it. Doc. 21 at 20.

Based on the holding of *Wyandotte Nation*, the Court is unable to conclude that Plaintiffs have made a strong showing that they are substantially likely to overturn the gaming decision based on the Supreme Court's holding in *Brand X*. Although *Wyandotte Nation* only specifically discussed the plain meaning of "land claim," its overall holding was that the "settlement of a land claim" exception applied to PL 602 funds under the ordinary meaning of the statute. Although Plaintiffs have arguably demonstrated a colorable argument that the Secretary wrongfully relied on *Wyandotte Nation*, they have not made a strong showing that is sufficient to warrant the extraordinary remedy of a preliminary injunction. *See Free the Nipple-Fort Collins*, 916 F.3d at 797; *New Mexico Dep't of Game & Fish*, 854 F.3d at 1245-46; *see also Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1285 (10th Cir. 2016) ("Based on the record and arguments before us in this appeal, however, Plaintiffs have failed to persuade us the district court abused its discretion in concluding that they have not shown a substantial likelihood of success under the deferential standard of review applicable to judicial review of agency actions.").[8]

### B.    Irreparable Harm

Plaintiffs argue that they will suffer irreparable harm without an injunction in two ways. First, they argue that allowing Wyandotte Nation to game on the Park City Parcel will usurp the state's right to approve gaming under 25 U.S.C. § 2719(b)(1)(A). Second, Plaintiffs argue they will suffer economic harm in the absence of an injunction because the Wyandotte Nation's gaming activity on the Park City Parcel will compete with a nearby casino from which the state, county, and city take a share of revenue.

---

[8]    Although the Court applies a heightened standard for disfavored injunctions that alter the status quo, it would still deny the preliminary-injunction motion under the normal standard based on the reasoning outlined above.

### 1.    Loss of Right to Approve Gaming

Plaintiffs first argue that, absent an injunction, the state will be deprived of its ability to approve gaming in Kansas. This argument is premised on the notion that the "settlement of a land claim" exception does <u>not</u> apply, under either *Wyandotte Nation* or under the 2008 regulations, and that, as a result, the only <u>actual path</u> for the Wyandotte Nation to conduct gaming on the Park City Parcel is under 25 U.S.C. § 2719(b)(1)(A), which permits gaming if the Secretary, the tribe, other nearby Indian tribes, and state and local officials determine that gaming is in the best interest of all involved, and the state's governor approves.

To the extent the state has authority to control gaming on the Park City Parcel, the loss of that authority could, under certain circumstances, constitute irreparable harm. *See Kansas*, 249 F.3d at 1227-28. But the Court disagrees that Plaintiffs have established such irreparable harm is enough to warrant entry of the requested preliminary injunction in this case. First, the Court notes that Plaintiffs intertwine this argument with reference to the trust decision, which is not currently at issue. Second, the claimed harm presumes that the gaming decision was wrong—something Plaintiffs have not demonstrated, as discussed above. Third, even if Plaintiffs are correct that gaming on the Park City Parcel should be evaluated under 25 U.S.C. § 2719(b)(1)(A), their ability to approve gaming in Kansas has not been <u>irreparably</u> lost. If Plaintiffs prevail on their challenge, and if the Wyandotte Nation seeks to conduct gaming under 25 U.S.C. § 2719(b)(1)(A), Plaintiffs will be able to have their say.

### 2.    Economic Harm

Plaintiffs' second argument is that they will suffer irreparable injury in the form of economic loss if the gaming decision is not enjoined. They contend that the Park City Parcel is within 25 miles of the Kansas Star Casino, from which the state, county, and city plaintiffs receive

a share of gross revenues. Plaintiffs argue that, if the Wyandotte Nation is permitted to open a temporary gaming facility and later a permanent casino on the Park City Parcel, it will cut into the Kansas Star Casino's profits and cause them to suffer economic harm,[9] which they will not be able to recover because both Defendants and the Wyandotte Nation possess sovereign immunity and cannot be sued for money judgements.

Defendants argue that economic harm, even where it is not recoverable, is not irreparable harm. But Plaintiffs maintain that their inability to recover this loss is precisely why it is irreparable. While it's true that simple economic loss is usually insufficient to constitute irreparable harm, *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003), a significant risk of financial injury under unique circumstances, such as inability to later recover money damages, may constitute irreparable injury. *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (noting that economic losses that cannot later be recovered because of sovereign immunity can constitute irreparable injury). But an inability to recover economic loss "does not, in and of itself, compel a finding of irreparable harm." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011). Accordingly, the Court disagrees with both parties that the potential economic loss in this case is always or never irreparable harm.

Instead, the issue is the likelihood and magnitude of the alleged injury. In seeking an injunction, a moving party must demonstrate that the claimed injury is <u>likely</u> to occur in the absence of an injunction. *Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

---

[9]    As noted above, Plaintiff Iowa Tribe of Kansas and Nebraska filed a notice joining in the preliminary-injunction motion. Doc. 18. But there is nothing in the briefs suggesting that it shares in the revenue of the Kansas Star Casino or is likely to suffer economic harm as a result of the Wyandotte Nation gaming on the Park City Parcel.

to such relief." *Id.* "Moreover, the injury must be likely to occur before the district court rules on the merits." *New Mexico Dep't of Game & Fish*, 854 F.3d at 1250 (internal quotations and citations omitted).

The loss must also be "certain and great," as opposed to "merely serious or substantial." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262-63 (10th Cir. 2004) (internal quotations and citations omitted); *see also Nat'l Mining Ass'n*, 768 F. Supp. 2d at 53 ("If a plaintiff has shown that financial losses are certain, imminent, and unrecoverable, then the imposition of a preliminary injunction is appropriate and necessary; here, however, the plaintiff has not demonstrated the certainness or the imminence of any of its members' losses.").

In support of their argument that they will suffer irreparable injury, Plaintiffs submit the affidavit of Will Cummings. *See* Doc. 14 at 23; *see also* Doc. 14-17.[10] The affidavit reflects Cummings's experience in researching and analyzing the economics of the gambling industry. Cummings originally prepared a report for the state in 2010 projecting impacts on the Kansas Star Casino of a competing tribal casino in Park City. Cummings updated his findings through August 2020 and considered the impact of a temporary or rudimentary facility with 500 machines on the Park City Parcel, as well as the impact of a permanent 1000-machine facility. Cummings projected that a 500-machine facility would cause the state to receive $1,524,072 less in revenue from the Kansas Star Casino over the next year, with losses to the local governments of $207,828 over that same time frame. The impact of a 1000-machine permanent casino would cause losses of $6,825,192 and $962,463, respectively. Cummings did adjust his projections based on an overall

---

[10]   The Tenth Circuit has cautioned that preliminary injunctions generally should not issue based on affidavits alone. *See Lane v. Buckley*, 643 F. App'x 686, 689 (10th Cir. 2016).

decrease in revenue based on the COVID-19 pandemic but assumed no further impacts from the virus as of August 2020.[11]

The Court is not persuaded that this demonstrates irreparable harm to Plaintiffs under the standards outlined above. First, Plaintiffs have not demonstrated that the Wyandotte Nation is actually operating a casino or gaming facility on par with those considered by Cummings. At most, they have produced news articles suggesting that the Wyandotte Nation is currently operating a small gaming facility in a trailer and that it has plans to open larger facilities at some point. But there is no evidence that the Wyandotte Nation is in fact operating either a 500-machine or 1000-machine gaming facility at this time, or that construction of either size facility will occur anytime in the immediate future. Indeed, the exhibits relied on by Plaintiffs suggest that construction on the permanent, larger casino apparently planned by the Wyandotte Nation is not scheduled to begin until next year. This makes the projected impact on the Kansas Star Casino largely speculative at this point and not at all imminent.

Second, the losses claimed are over the course of a year. Even without an injunction, it is unlikely that these losses will occur before the Court has an opportunity to rule on the merits of this case. *See New Mexico Dep't of Game & Fish*, 854 F.3d at 1250. As explained further below, the Court will endeavor to timely resolve this case.

Third, the briefs have raised questions about whether and to what extent the requested injunctive relief—enjoining the gaming decision by the Secretary—would actually prevent the potential harm claimed by Plaintiffs, namely the operation of a gaming facility on the Park City Parcel in competition with the Kansas Star Casino. The Court notes that the Wyandotte Nation is

---

[11]  The Court notes that, at the time of this order, COVID-19 continues to impact the world. Very recently, the District of Kansas issued Amended Administrative Order 2020-12 suspending all civil and criminal jury trials until after January 4, 2021, due to the currently rising number of COVID-19 cases. Thus, it seems Cummings's estimate of no further impact after August 2020 is not realistic.

not a party to this case. Thus, although the Court could enjoin the gaming decision, the parties have generally not explained how or whether this would prevent the Wyandotte Nation from gaming on the Park City Parcel. Plaintiffs suggest that enjoining the gaming decision would mean there is no lawful gaming determination in effect for the Park City Parcel, and that the Chairman of the NIGC could then take action to order temporary closure of any gaming facility on the Park City Parcel. But Plaintiffs have not explained how this would occur, or by what mechanism.

Accordingly, the Court concludes that Plaintiffs have not met their burden of establishing that they will suffer irreparable harm absent an injunction.[12]

### C. Remaining Preliminary-Injunction Factors

Because the Court has found Plaintiffs have not demonstrated a substantial likelihood of success on the merits or that they will suffer irreparable harm without an injunction, the Court concludes that Plaintiffs' preliminary-injunction motion should be denied on those grounds. It therefore need not reach the remaining preliminary-injunction factors.

### D. Scheduling

The deadline to file the administrative record is December 11. Doc. 15 at 2. Under District of Kansas Local Rule 83.7.1(d), Plaintiffs' opening brief is due 45 days after the record is filed. Defendants' response is due 30 days after that, and any reply brief is due 14 days after the response is filed. Mindful of the long history of this ongoing dispute, and with an eye to Rule 1's goal of a "just, speedy, and inexpensive determination of every action," the Court will endeavor to timely resolve this matter. To the extent the parties believe this schedule will require adjustment, they are

---

[12]   Similar to likelihood of success, the Court would deny the preliminary injunction for lack of irreparable harm based on this reasoning even if the requested injunction was not disfavored and the more relaxed standard applied.

encouraged to consult with each other and contact chambers to request a status conference so that

this case can remain on track for an efficient and timely resolution.

## IV.     CONCLUSION

THE  COURT  THEREFORE  ORDERS  that  Plaintiffs'  Motion  for  Temporary  and

Preliminary Injunctive Relief and/or Stay of Administrative Action (Doc. 13) is DENIED.

IT IS SO ORDERED.

Dated: November 23, 2020                         /s/ *Holly L. Teeter*
                                                 HOLLY L. TEETER
                                                 UNITED STATES DISTRICT JUDGE