## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**KANSAS, STATE OF, et al.,**

      **Plaintiffs,**

      **v.**

**UNITED STATES DEPARTMENT OF INTERIOR, et al.,**

      **Defendants.**

**Case No. 2:20-cv-02386-HLT-GEB**

### MEMORANDUM AND ORDER

This is an Administrative Procedures Act ("APA") case brought by Plaintiffs, who are governmental entities in Kansas and two Indian tribes. They are appealing the May 20, 2020 decision of the Secretary of the Department of the Interior ("Secretary") and Assistant Secretary for the Bureau of Indian Affairs (collectively, "Defendant") to acquire property known as the Park City Parcel in trust for the benefit of the Wyandotte Nation and to allow the Wyandotte Nation to conduct gaming on the land. Plaintiffs argue that both the Secretary's trust determination and gaming determination were arbitrary and capricious. For the reasons explained below, the Court affirms both the trust and gaming determinations.

## I.      BACKGROUND

### A.      Wyandotte Nation and PL 602

Beginning in the 1700s, the Wyandot (now known and referred to here as the "Wyandotte Nation") were relocated and removed several times from Canada, Michigan, Ohio, and Kansas. In 1855, they were finally moved to Oklahoma. Many of these moves involved treaties in which the Wyandotte Nation ceded or relinquished land to the United States.

In the 1970s, the Wyandotte Nation brought four claims before the Indian Claims Commission ("ICC") seeking compensation for the land ceded under those treaties. These claims resulted in money judgments against the United States and in favor of the Wyandotte Nation.

In 1984, Congress passed Public Law 98-602—referred to here as PL 602—"[t]o provide for the use and distribution of certain funds awarded the Wyandotte Tribe of Oklahoma." PL 602 provided for the distribution of approximately $4.7 million awarded as part of the ICC claims. Eighty percent of the money went to individual members of the Wyandotte Nation. The remaining 20%—approximately $939,000—was allocated to the Wyandotte Nation itself, with the caveat that $100,000 of those funds were to "be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of [the Wyandotte Nation]." AR 3969. This is known as the "mandatory trust" provision of PL 602. These funds are referred to as "land-acquisition funds."[1]

The Wyandotte Nation initially held the land-acquisition funds separately from its general fund and invested the land-acquisition funds in mortgage bonds in the late 1980s. But in 1991, the Wyandotte Nation merged its land-acquisition funds with its general fund into a commingled account. Tracking the value and use of the land-acquisition funds since that time has been the subject of litigation since the 1990s. *See Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1249 (10th Cir. 2006) ("This long battle has produced a procedural history as complex as a random maze.").

**B.    Indian Gaming Regulatory Act**

The Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, was enacted to regulate Indian gaming. *See Wyandotte Nation v. Nat'l Indian Gaming Comm'n*, 437 F. Supp. 2d

---

[1]    At different parts of the record, the land-acquisition funds are referred to as simply the PL 602 funds. But as used here, the land-acquisition funds are a subset of the overall funds distributed in PL 602.

1193, 1199 (D. Kan. 2006). IGRA's purpose is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). IGRA also established the National Indian Gaming Commission ("NIGC"). *Id.* at § 2704. IGRA generally prohibits gaming on lands acquired in trust by the United States for the benefit of an Indian tribe after October 17, 1988. *Id.* at § 2719(a). There are some exceptions to that general rule. Relevant here is the exception that gaming is permitted on lands taken into trust as part of a "settlement of a land claim." *Id.* at § 2719(b)(1)(B)(i). If an exception does not apply, gaming is permitted only after consultation with the Secretary, the tribe, nearby tribes, and state and local officials, and if the governor of the state in question agrees that gaming is in the best interest of all involved. *Id.* at § 2719(b)(1)(A).

### C.     Shriner Tract Litigation

For 14 years, many of the same parties in this case litigated the use of land-acquisition funds for the purchase of a piece of land in Kansas City, Kansas, known as the Shriner Tract. The Wyandotte Nation purchased the Shriner Tract in 1996 for $180,000. After acquiring the Shriner Tract, the Wyandotte Nation requested that it be taken into trust under the mandatory-trust provision in PL 602. The Secretary concluded it should be taken into trust. But the state and other tribes sued the Secretary to stop the acquisition. The Shriner Tract litigation that resulted includes several rulings that impact the current dispute.

In the first relevant case, the Tenth Circuit found that the Secretary is required to take lands purchased with land-acquisition funds into trust for the Wyandotte Nation. *See Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1262 (10th Cir. 2001). Although the decision to take land into trust is generally discretionary under federal law, PL 602's plain language that land purchased with land-acquisition funds "shall be held in trust by the Secretary for the benefit of [the Wyandotte

Nation]" leaves the Secretary no discretion. *Id.* at 1261-62. But even though land purchased with land-acquisition funds are subject to mandatory-trust status, in the case of the Shriner Tract specifically, the Tenth Circuit found that there was no substantial evidence to support a determination that the Wyandotte Nation used only land-acquisition funds to purchase the Shriner Tract. Accordingly, it remanded the Secretary's initial decision to take the Shriner Tract into trust for further consideration. *Id.* at 1263-64.

On remand, the Secretary subsequently issued a decision that concluded that the Wyandotte Nation used land-acquisition funds to purchase the Shriner Tract and that it was entitled to mandatory-trust status. *See Governor of Kansas v. Norton*, 430 F. Supp. 2d 1204, 1209 (D. Kan. 2006) (referred to throughout this order as "*Norton*"). The agency decision was based in part on a report by KPMG Peat Marwick ("KPMG Report"), which concluded that the land-acquisition funds had grown to $212,170 at the time the Shriner Tract was purchased for $180,000. *Id.* at 1215-16.

After that agency decision was again appealed to the district court, Judge Julie Robinson, in *Norton*, affirmed the Secretary's decision. In particular, Judge Robinson found that PL 602 did not preclude the addition of investment earnings to the originally allocated $100,000 in land-acquisition funds. *Id.* 1220-21. In other words, the Wyandotte Nation could use the $100,000, along with any interest and earnings it generated, to purchase land that qualifies for mandatory-trust status in PL 602. *Id.*[2]

---

[2]   *Norton* was subsequently vacated by the Tenth Circuit after it concluded the district court lacked jurisdiction. *See Governor of Kansas v. Kempthorne*, 516 F.3d 833, 846 (10th Cir. 2008). The Supreme Court has since held that the APA provides a waiver of sovereign immunity against the United States for suits challenging a decision to take land into trust for an Indian tribe. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Finally, in a separate but related case, Judge Robinson reviewed a decision of the NIGC that the Wyandotte Nation could not lawfully conduct gaming on the Shriner Tract. *See Wyandotte Nation*, 437 F. Supp. 2d at 1196. Among the issues in that case was whether the Shriner Tract was eligible for gaming under the "settlement of a land claim" provision in IGRA. *Id.* at 1207-12. Judge Robinson concluded that lands purchased with land-acquisition funds were eligible for gaming under IGRA's "settlement of a land claim" exception. *See id.* at 1210. Specifically, Judge Robinson found that the claims ultimately paid in PL 602 were "land claims" within the meaning of IGRA. *Id.* at 1207-09. This was because the "plain meaning" of "land claim" is not limited to a claim "for the return of land, but rather, includes an assertion of an existing right to the land." *Id.* at 1208. And it included the claims brought before the ICC that gave rise to PL 602. *See id.* Accordingly, *Wyandotte Nation* ultimately held that because the Shriner Tract was purchased with land-acquisition funds, it qualified for IGRA's "settlement of a land claim" exception. *Id.* at 1210.

### D.      Park City Parcel

In 1992, before the purchase of the Shriner Tract, the Wyandotte Nation purchased the Park City Parcel for $25,000. The Park City Parcel is approximately 10 acres of land near Park City in Sedgwick County, Kansas. Shortly after purchasing the Park City Parcel, the Wyandotte Nation sought trust status for it, but they later withdrew that application. But in 2008, the Wyandotte Nation resubmitted a trust application for the Park City Parcel based on the assertion that the land was, like the Shriner Tract, purchased with land-acquisition funds. The dispute over the Park City Parcel has largely focused on whether the land-acquisition funds plus interest were sufficient to purchase both the Park City Parcel and the Shriner Tract.

### 1.      2014 Denial

On July 3, 2014, the Secretary denied the Wyandotte Nation's request to acquire the Park City Parcel in trust because the record at the time suggested that there were not sufficient land-acquisition funds (which included the principal $100,000 and any earnings or interest) to buy both it and the Shriner Tract ("2014 Denial"). AR5249-58.

As part of the Park City Parcel application, the Wyandotte Nation submitted documentation showing that the Park City Parcel was purchased in November 1992, after the land-acquisition funds were commingled in the general account. AR1581. It had previously been assumed that the Wyandotte Nation bought the Park City Parcel in November 1991 with funds withdrawn directly from the account holding the land-acquisition funds, before the accounts were commingled. But a title dispute in 1991 delayed the purchase, and that money was immediately deposited into the Wyandotte Nation's general fund. Then, after the Wyandotte Nation combined its accounts, it withdrew $25,000 from the commingled account to purchase the Park City Parcel in November 1992. AR5254.

As the Secretary noted in the 2014 Denial, the new information about the actual timing of the Park City Parcel purchase, which came <u>after</u> the commingling of the accounts, is why the issue in this case turns on a forensic accounting determination of whether there were sufficient land-acquisition funds in the commingled account to cover the purchase of the Park City Parcel and the Shriner Tract. *Id.* In other words, the payment for the Park City Parcel did not come from an account holding just land-acquisition funds. It came from an account holding both land-acquisition funds and other funds. And because the Shriner Tract had already been determined to have been purchased using land-acquisition funds at the time of 2014 Denial, the Secretary had to consider

whether there were sufficient land-acquisition funds in the commingled account to cover <u>both</u> the Park City Parcel and the Shriner Tract. AR5254-55.

In answering that question, the Secretary concluded that the evidence presented by the state called into question whether there were sufficient land-acquisition funds to purchase both properties. The Secretary noted that the state made several arguments "regarding the scope of the Secretary's authority under the Act, the gaming eligibility of the Park City Parcel, and the sufficiency of the Shriner Tract accounting." AR5255. The Secretary went on to note:

> We do not address each of the State's arguments in this decision, in part because it is unnecessary to do so in light of our decision to deny the Nation's application. In addition, we have reviewed the Shriner Tract litigation record and confirmed that, except for the issue discussed below, the State's accounting arguments were raised and resolved in connection with the Shriner Tract litigation, and therefore, we decline to revisit those issues now.

*Id.* The 2014 Denial specifically noted that the state raised several objections to the KPMG Report in the context of the Park City Parcel, as it had with regard to the Shriner Tract, which were addressed and resolved in the course of the Shriner Tract litigation. *Id.* at n.37. The Secretary also rejected the state's argument that Department of Interior officials understood that PL 602 only permitted one acquisition of land when it approved the purchase of the Shriner Tract. *Id.*

But the Secretary did consider one argument not addressed by the Shriner Tract litigation. It was based on an accounting report submitted by Gottlieb, Flekier & Co ("Gottlieb Report"), which the state commissioned to evaluate the KPMG Report. The Gottlieb Report focused on the Wyandotte Nation's use of margin loans and the associated interest-related deductions of these loans. Although these deductions appeared on the financial statements, the KPMG Report did not factor them into its analysis, which caused it to overstate the value of the land-acquisition funds. *See* AR3821. The Gottlieb Report concluded that, after factoring in the interest-related deductions,

there were enough funds to purchase the Shriner Tract or the Park City Parcel, but not both. AR5256-58; AR3822.[3] The Secretary found this evidence "compelling," especially in light of the new information about the timing of the Park City Parcel purchase. AR5256. Accordingly, the Secretary concluded that the Wyandotte Nation could not have purchased the Park City Parcel using just land-acquisition funds and denied the trust application. *Id.*

Although the Secretary relied on the Gottlieb Report, the 2014 Denial noted the report was based on incomplete records. AR3817. Specifically, the Gottlieb Report noted that certain other records would be needed "for purposes of complete documentation," but "[i]f no other documents are furnished, those conclusions are sound and accurate." AR3818. The Wyandotte Nation was given a chance to rebut the Gottlieb Report but opted to stand on the KPMG Report. AR5257. Because this didn't address the issues raised by the Gottlieb Report and the new information about the timing of the Park City Parcel purchase, the Secretary concluded that he could not conclude that the Park City Parcel was a mandatory trust acquisition under PL 602. AR5258. But the Secretary did note that the Wyandotte Nation "would be free to submit a new application" if it was able to rebut the issues raised by the state. *Id.*

### 2. May 2020 Decision

In October 2017, the Wyandotte Nation supplemented its application for the Park City Parcel ("2017 Supplement"). AR3980-84. As part of the 2017 Supplement, the Wyandotte Nation submitted newly retrieved annual audits ("Ober Audits") and a financial analysis prepared by the auditing firm RSM US, LLP ("RSM Report"). AR4482; AR3981.

---

[3]   Although the Wyandotte Nation purchased the Shriner Tract after the Park City Parcel, at the time of the 2014 Denial regarding the Park City Parcel, the Shriner Tract acquisition and trust status was a settled issue. AR5255.

In the 2017 Supplement, the Wyandotte Nation explained it was submitting the RSM Report to address the accounting issues discussed in the 2014 Denial. AR3981. The RSM Report was based on the Ober Audits for the PL 602 funds for the years 1986 through 1996, with the exception of 1988.[4] *Id.*; AR4023-24. The Ober Audits were obtained from the Bureau of Indian Affairs. They traced all the PL 602 funds allocated to the Wyandotte Nation itself (as opposed to the individual members), including the $100,000 land-acquisition funds and other funds allocated for general use. AR4023. From this information, the RSM Report was able to allocate a percentage of the investment earnings to the land-acquisition funds. AR4025. But it also accounted for the interest expenses on the margin account. AR3983; AR4025. The RSM Report also discounted interest income for the years that the Park City Parcel and Shriner Tract were purchased to account for the days in the fiscal year that the purchases would have reduced the income earned. AR4025.

Ultimately, the RSM Report concluded that the land-acquisition funds showed relatively constant growth. At the beginning of the fiscal year in which the Park City Parcel was purchased, the land-acquisition funds had a balance of $173,647, which was enough to cover the $25,000 cost of the property. AR4026. Even accounting for the Park City Parcel purchase, at the beginning of the fiscal year in which the Shriner Tract was purchased, the land-acquisition funds had a balance of $187,950, which was enough to cover its $180,000 cost. *Id.*; *see also* AR4029, AR3933. Accordingly, the RSM Report concluded that there were sufficient land-acquisition funds, which included principal plus earnings, to purchase both the Park City Parcel in 1992 and the Shriner Tract in 1996. AR4026.

---

[4]   A separate audit report for all the Wyandotte Nation's funds from 1988 was included, and from that report, RSM was able to identify accounts related to the land-acquisition funds. AR4024. Interest, dividend income, and interest expenses for 1988 were derived from the known income and interest expenses for 1987 and 1989. AR4025.

### a.      Park City Parcel Trust Determination

The Secretary considered these additional materials in addressing what was deemed to be the "sole remaining question after years of litigation": whether the Wyandotte Nation used land-acquisition funds alone to purchase the Park City Parcel. AR4483. On May 20, 2020, the Secretary issued its decision on this issue ("May 2020 Decision").

The May 2020 Decision recounted the history of the Wyandotte Nation's land disputes involving the Shriner Tract and the 2014 Denial regarding the Park City Parcel. AR4483-88. The Secretary then considered the 2017 Supplement and the RSM Report. The RSM Report deducted margin interest costs before the interest earned was added to the land-acquisition funds, which addressed the Gottlieb Report's prime critique of the KPMG Report. AR4488-89.

The May 2020 Decision also noted that the Office of Financial Management ("OFM") reviewed the RSM Report and the underlying documents. AR4489; *see also* AR3932-34. It noted that the OFM "concluded the RSM Report's methodology, calculations, and assumptions are consistent with industry standards and the RSM Report's conclusions are reliable." AR4490; *see also* AR3932 (memorandum from the OFM). The OFM concluded that the "RSM Report deducted margin interest-related costs before interest earned was attributed to the Land Acquisition Fund" and "addressed the Gottlieb Report's critique of the KPMG Report and ensured the growth of the Land Acquisition Fund was not overstated." AR3934.

Based on the new information provided and the opinion of the OFM, the Secretary found the "2017 Supplement and rebuttal of the Gottlieb Report to be convincing and reliable." AR4491. The May 2020 Decision adopted the conclusion of the RSM Report that there were sufficient land-acquisition funds to purchase both the Park City Parcel and the Shriner Tract. *Id.* Because the Park

City Parcel was purchased with land-acquisition funds, the Secretary was "mandated to acquire the Park City Parcel in trust." AR4492-93.

### b.   Park City Parcel Gaming Determination

The May 2020 Decision also addressed the eligibility of the Park City Parcel for gaming. Having determined that the Park City Parcel was acquired with land-acquisition funds, the Secretary concluded "that the [Wyandotte] Nation may conduct gaming pursuant to the 'settlement of a land claim' exception to Section 2719 of IGRA . . . consistent with the Department's acquisition of the Shriner Tract as upheld by the court in 2006 in *Wyandotte Nation v. [T]he National Indian Gaming Commission*." AR4491.

### E.   2008 Regulations

Also relevant to this dispute are some regulations promulgated in 2008 by the Department of the Interior ("2008 Regulations). The 2008 Regulations address IGRA's "settlement of a land claim" exception. They define "Land claim," *see* 25 C.F.R. § 292.2, and set forth "criteria for meeting the requirements of 25 U.S.C. [§] 2719(b)(1)(B)(i), known as the 'settlement of a land claim' exception," 25 C.F.R. § 292.5. The May 2020 Decision did not address or apply the 2008 Regulations.[5]

### F.   Appeal of May 2020 Decision

Plaintiffs appealed the May 2020 Decision to this Court a few months after it was issued. The Court previously denied a preliminary-injunction motion that sought an injunction of the

---

[5]   The Wyandotte Nation applied for trust status for the Park City Parcel before these regulations were enacted, but the May 2020 Decision was issued after their enactment. A separate regulation states that "[t]hese regulations apply to final agency action taken after the effective date of these regulations except that these regulations shall not apply to applicable agency actions when, before the effective date of these regulations, the Department or the National Indian Gaming Commission (NIGC) issued a written opinion regarding the applicability of 25 U.S.C. [§] 2719 for land to be used for a particular gaming establishment, provided that the Department or the NIGC retains full discretion to qualify, withdraw or modify such opinions." 25 C.F.R. § 292.26. Although the parties dispute whether it was improper for the Secretary not to consider these regulations, neither party argues that they were inapplicable because of the timing of their enactment.

gaming determination only because Plaintiffs had not demonstrated a likelihood of success on the merits or irreparable harm. Doc. 22 at 1. Plaintiffs now substantively challenge both the trust determination and the gaming determination as arbitrary and capricious. They seek reversal of the May 2020 Decision and an order that the Secretary take the Park City Parcel out of trust. Doc. 34 at 68. Defendant has filed a brief in opposition, Doc. 40, and Plaintiffs have replied. Doc. 41.[6]

## II.   STANDARD

A party "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" may seek judicial review. 5 U.S.C. § 702. The focus of judicial review is determining (1) whether the agency acted within its authority; (2) whether prescribed procedures were followed; and (3) whether the agency action is otherwise arbitrary, capricious, or an abuse of discretion. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994); *see also* 5 U.S.C. § 706(2). The arbitrary-and-capricious standard requires a court to give an agency's decision "substantial deference." *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1173 (10th Cir. 2002). A court "presume[s] that an agency action is valid unless the party challenging the action proves otherwise." *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 (10th Cir. 2020).

"Arbitrary and capricious" is a narrow standard. *Colo. Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006). Courts review "whether the agency examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made." *Id.* Courts consider whether "the agency has relied on factors which Congress has not intended it to consider, entirely failed to

---

[6]   Plaintiffs' brief includes a request for oral argument. The Court has determined that oral argument is not necessary and that this matter can be resolved on the briefs.

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). But even if an agency decision reflects "less than ideal clarity," it should be upheld if the "agency's path may reasonably be discerned." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). A court is not permitted to substitute its judgment for that of an agency. *Id.* at 513.

Although an agency's decision "is entitled to a presumption of regularity," that does not obviate the need for a thorough review. *Olenhouse*, 42 F.3d at 1574. To this end, an agency decision must be supported by substantial evidence in the administrative record to avoid being arbitrary and capricious. *Colo. Wild*, 435 F.3d at 1213. Substantial evidence is more than a scintilla but less than the weight of the evidence. *Id.* An agency's decision can be upheld only on the basis articulated by the agency. *Olenhouse*, 42 F.3d at 1575.

Ultimately, a court considers "whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Colo. Wild*, 435 F.3d at 1213. Courts do not substitute their judgment for that of an agency and will "typically defer to the reasonable opinions of agency experts in matters implicating conflicting expert opinions." *Id.* at 1213-14 (internal quotation and citation omitted).

## III.   ANALYSIS

There are three issues before the Court. First, Defendant moves to strike an exhibit attached to Plaintiffs' brief as extra-record material not properly before the Court. Doc. 35. The Court

previously indicated it would take up the motion to strike when it considered Plaintiffs' opening brief. Doc. 37.

Second, Plaintiffs challenge the trust determination made in the May 2020 Decision. Plaintiffs argue it should be set aside as arbitrary and capricious, violative of department policy, unlawful, and an abuse of discretion. Specifically, they argue the May 2020 Decision (1) failed to address a departmental policy developed during the Shriner Tract litigation that no further mandatory-trust acquisitions could be based on PL 602 after the full $100,000 was spent on the Shriner Tract; (2) wrongfully accepted the Park City Parcel into trust even though it was purchased with only earnings on the $100,000, and none of the principal, which does not trigger the mandatory-trust provision of PL 602; and (3) wrongfully accepted the Park City Parcel into trust even though it was not purchased with land-acquisition funds.

Third, Plaintiffs challenge the gaming determination in the May 2020 Decision. They make three arguments: (1) the 2008 Regulations control whether the Park City Parcel is eligible for gaming and those regulations dictate that PL 602 is not a "settlement of a land claim," (2) the *Wyandotte Nation* decision relied on by the Secretary is not applicable because the Park City Parcel was not purchased with the land-acquisition funds but only with the interest earned by those funds, and (3) the Secretary failed to address that a case relied on by *Wyandotte Nation* was later reversed.

### A.      Motion to Strike Extra-Record Material

The Court first addresses Defendant's motion to strike an exhibit attached to Plaintiffs' brief that challenges the calculations in the RSM Report . Plaintiffs attached to their opening brief a newly created affidavit by Jerry Gottlieb, which includes two exhibits (collectively, "Gottlieb Affidavit"). Doc. 34-14. Plaintiffs rely on the Gottlieb Affidavit to challenge the RSM Report's treatment of certain account balances and its exclusion of the Veres Investment from consideration.

14

The Gottlieb Affidavit is distinct from the Gottlieb Report, which is part of the administrative record. Defendant moves to strike the Gottlieb Affidavit as improper extra-record evidence. Doc. 35.

Judicial review of an administrative action is generally limited to the record that existed before the agency. *Citizens for Alts. to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007). There are "extremely limited" exceptions. *Id.* (quoting *Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004)). These include where the agency ignored relevant factors, considered factors not in the formal record, or where there is a showing of bad faith or improper behavior. *See id.* The Tenth Circuit has also permitted extra-record evidence if the record fails to disclose the factors considered by the agency, where necessary for background information or determining whether all relevant factors were considered, or as needed to explain technical or complex subject matter. *Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision*, 934 F.2d 1127, 1137-38 (10th Cir. 1991). Whether to include or exclude extra-record evidence is within the discretion of the district court. *Citizens for Alts. to Radioactive Dumping*, 485 F.3d at 1096. Designation of the administrative record is also entitled to a presumption of regularity. *Id.* at 1097.

The Gottlieb Affidavit generally takes issue with some of the factual assumptions relied on by the RSM Report. It includes two exhibits in the form of "illustrative charts" that calculate the amount of available land-acquisition funds had the RSM Report used a different account balance before the investment accounts were commingled and had it allocated the Veres Investment differently. *See generally* Doc. 34-14.

Plaintiffs contend this is not extra-record material because it is based on documents in the record. Doc. 36 at 2. On this point, the Court disagrees. While the underlying documents relied on

may be part of the administrative record, the conclusions drawn in the affidavit and its exhibits are new.

To the extent the Gottlieb Affidavit is extra-record material, Plaintiffs maintain it should nevertheless be considered because it would "not shift the focal point of judicial review" and would "allow the Court to better understand information that is already in the administrative record and illustrate the arguments Plaintiffs are making from the administrative record." *Id.* at 15. The Court disagrees that this is sufficient grounds to expand the scope of review beyond the existing administrative record. As explained above, the Secretary was concerned in the May 2020 Decision with whether there were sufficient land-acquisition funds if certain interest-related deductions were considered. What the Court is concerned with now is whether there is substantial evidence to support the May 2020 Decision and whether it was arbitrary and capricious. What Plaintiffs have proposed is essentially <u>new</u> expert material that would introduce new conclusions on these issues. This is not proper at this stage. Nor does the Gottlieb Affidavit satisfy any the exceptions for considering extra-record evidence.[7]

Accordingly, the Court grants Defendant's motion to strike to the extent it seeks to strike the Gottlieb Affidavit.[8] The Gottlieb Affidavit will not be considered.

---

[7]   The Court acknowledges Plaintiffs' complaint that they were not notified of the 2017 Supplement and thus did not present evidence in advance of the May 2020 Decision. But they have not presented any arguments or authorities suggesting their participation was required or that the May 2020 Decision was procedurally flawed in this respect, nor do they allege bad faith necessitates consideration of the Gottlieb Affidavit.

[8]   Defendant's motion to strike seeks other relief, including requesting a stay of the briefing, striking portions of Plaintiffs' opening brief, and extension of the response deadline. Doc. 35 at 5-6. The Court previously declined to act on several of these requests. Doc. 37. To the extent the motion to strike seeks relief beyond striking the Gottlieb Affidavit, the Court denies the motion.

B.      **Trust Determination**

1.      **The May 2020 Decision was not arbitrary and capricious for not addressing the department policy because that argument was addressed and rejected in the 2014 Denial.**

Plaintiffs first argue that the May 2020 Decision should be set aside as arbitrary and capricious because it fails to mention, address, or explain a departure from a so-called department policy that the PL 602 mandatory-trust provision was exhausted with the Shriner Tract. Doc. 34 at 44-46. To establish the department policy, Plaintiffs primarily rely on three Department of Interior memos. First is a memo from Tom Hartman[9] commenting that, "[i]f the purchase price of the Shriner Tract exceeds $100,000, then the Department should state clearly that the settlement funds have been expended in accordance with the law, and that no funds remain to implement further the 'shall' of the law." AR2320. Second is a June 1996 memo from George Skibine, Director of the Indian Gaming Management Staff, stating that the Muskogee Area Office "must inform the Tribe that the acceptance in trust of the Shriner tract exhausts the land acquisition authority of Pub. L. 98-602, and that subsequent trust acquisitions for the Tribe must be made under other statutory authority." AR2326. Third is a June 1996 memo from Ada Deer, Assistant Secretary for Indian Affairs, stating that transfer of the Shriner Tract into trust "fulfills the Secretary's obligation to take land in trust pursuant to Pub. L. 98-602, and that subsequent trust acquisitions must be made under a different statutory authority." AR2328-29. Plaintiffs also point to similar statements in depositions and briefs in the Shriner Tract litigation.

As a preliminary matter, the Court harbors some doubts that any such binding department policy was created based on the statements cited by Plaintiffs. Plaintiffs don't point to anything in

---

[9]    This document itself does not establish that it is a memo from Tom Hartman, but a handwritten note at the bottom suggests it is, and that is what Plaintiffs represent it to be. Doc. 41 at 7-8.

any final agency decision about the Shriner Tract that placed such a limitation on the Wyandotte Nation. Plaintiffs likewise have not made persuasive arguments that statements in memos create a binding policy on subsequent agency action. The Court nonetheless finds that, even if there once was such a policy, the May 2020 Decision was not arbitrary and capricious for failing to address it.

The arbitrary-and-capricious standard requires a rational and satisfactory explanation for a decision that is supported by substantial evidence. *See Colo. Wild*, 435 F.3d at 1213. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). But this is not a heightened standard. *F.C.C.*, 556 U.S. at 514. All that's required is "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515-16.

In this case, that explanation came in the 2014 Denial. There, the Secretary, albeit in a footnote, stated:

> The State also contends that Department officials understood that only one acquisition was permitted by the Act when it approved the Shriner Tract acquisition in 1996. . . . Not only does the Act not limit the number of acquisitions by its express terms, the statements the State identifies were made before the Department had the benefit of an accounting of the 602 Funds to know how much the 602 Funds had grown in value by July 1996.

AR5255. As explained above, the Secretary went on to deny the trust application for the Park City Parcel based on issues identified in the Gottlieb Report about interest-related deductions, which called into question whether there sufficient land-acquisition funds (principal plus interest) to purchase both the Park City Parcel and the Shriner Tract. AR5258. But that decision was made

with the explicit caveat that the Wyandotte Nation could submit a new application if it could find additional records that would address the interest-related deductions. *Id.*

That is what the Wyandotte Nation did when it submitted the 2017 Supplement that led to the May 2020 Decision. AR4482-83, AR4488. The additional materials submitted accounted for the interest-related deductions and showed that the land-acquisition funds were sufficient to cover both the Park City Parcel and the Shriner Tract. AR44889-91. Based on holdings in the Shriner Tract litigation, the Secretary determined that this conclusion mandated acquisition of the Park City Parcel in trust. AR4492-93.

To the extent the Secretary "fail[ed] to make mention of [the] long established Department policy" in the May 2020 Decision, as Plaintiffs allege, Doc. 34 at 46, there was no reason for the Secretary to address it in the May 2020 Decision because the issue had already been addressed in the 2014 Denial. In that 2014 Denial, which it doesn't appear that Plaintiffs ever timely sought review of, the Secretary rejected application of the so-called policy because PL 602 itself does not limit the number of properties that can be acquired, and because the statements at issue were made before additional information about the land-acquisition funds had come to light. The Court does not find the May 2020 Decision arbitrary and capricious for not addressing an issue that had already been addressed and rejected. In other words, there was no departure from policy in the May 2020 Decision—any such policy had already been rejected given its conflict with the statute and a change in facts and circumstances.[10]

In the reply brief, Plaintiffs challenge the explanation given in the 2014 Denial. Doc. 41 at 14-16. But the Court does not adopt this challenge for three reasons. First, it was raised for the first

---

[10]  Plaintiffs also suggest, in half a sentence, that the Secretary should be judicially estopped from changing its position. Doc. 34 at 46. This argument is not adequately developed in Plaintiffs' opening brief. *Phillips v. Calhoun*, 956 F.2d 949, 954 (10th Cir. 1992). Nor does it address the fact that the Plaintiffs failed to challenge the 2014 Denial, where the change in position allegedly occurred.

time in the reply brief, which is procedurally improper. Second, Plaintiffs are challenging the May

2020 Decision, not the 2014 Denial. Doc. 1 at 35-36. Third, an agency "need not demonstrate to a

court's satisfaction that the reasons for the new policy are <u>better</u> than the reasons for the old one;

it suffices . . . that there are good reasons for it, and that the agency <u>believes</u> it to be better . . . ."

*F.C.C.*, 556 U.S. at 515 (emphasis in original). As explained above, the 2014 Denial rejected the

Plaintiffs' argument on this point because any such policy was not consistent with the plain

language of PL 602 and new facts about the growth of the land-acquisition funds had come to

light. This is a sufficiently reasoned explanation.

> ### 2.   Plaintiffs' argument that the Park City Parcel was purchased with only the earnings on the land-acquisition funds does not demonstrate that the May 2020 Decision was arbitrary and capricious.

Plaintiffs' second argument is that the trust determination was arbitrary and capricious

because the Secretary applied the mandatory-trust provision of PL 602 to the Park City Parcel even

though the land was purchased with only the earnings on the land-acquisition funds and none of

the principal. Doc. 34 at 46-48. This argument is based on Plaintiffs' beliefs, as discussed above,

that the full $100,000 principal was exhausted in the Shriner Tract purchase, and that land

purchased with <u>only</u> interest earned on those funds is not eligible for mandatory-trust status under

PL 602. The Court finds this argument fails to establish that the trust determination was arbitrary

and capricious.

As a preliminary matter, Plaintiffs' arguments are aimed not at what the Secretary actually

concluded in the May 2020 Decision, but on their interpretation of that decision. The Secretary did

not determine that the Park City Parcel was purchased with only the earnings on the land-

acquisition funds or address whether that would be legally permissible. As explained above, the

May 2020 Decision focused on whether there was sufficient value in the investments purchased

with the land-acquisition funds to cover both the Shriner Tract and Park City Parcel if properly accounting for interest-related deductions. AR4489. This was accomplished by tracking the growth of the investments purchased with the land-acquisition funds and deducting the interest-related costs attributable to margin loans. AR4489-91. The amount left was sufficient to cover the purchases of both properties. The Secretary thus concluded that the Park City Parcel was entitled to mandatory-trust status just as the Shriner Tract had been.

Rather than challenging this decision directly, Plaintiffs argue that the history of the Shriner Tract litigation and the language of PL 602 demonstrate that the Secretary effectively—but wrongly—permitted the Park City Parcel to be taken into to trust under PL 602 even though it was purchased with <u>only</u> interest on the land-acquisition funds. This is based on two arguments. But the Court disagrees that either demonstrates that the May 2020 Decision was arbitrary and capricious.

First, Plaintiffs contend that the $100,000 that composed the <u>principal</u> of the land acquisition funds was specifically spent in the Shriner Tract purchase. But this position is not sustainable given the history of the Shriner Tract litigation. As Judge Robinson explained, the Shriner Tract was purchased with funds drawn from the Wyandotte Nation's investment account, in the form of a margin account loan against the account that held, in part, investments purchased with the land-acquisition funds. *Norton*, 430 F. Supp. 2d at 1216. The land-acquisition funds were originally invested in bonds, and those bonds were never liquidated to purchase the Shriner Tract. *Id.* at 1212. Rather, the "margin account loan [used for the Shriner Tract] was made against the

market value of the holdings in the account," which included the investments purchased with the land-acquisition funds "plus accumulated interest." *Id.* (emphasis added).[11]

The Court understands Plaintiffs' position that the full $100,000 that composes the principal of the land-acquisition funds should, for lack of a better word, be allocated entirely to the Shriner Tract purchase based on statements made during that administrative process. The Court disagrees. It's simply not reflective of how either the Shriner Tract or the Park City Parcel was purchased. Both were purchased using margin account loans against the value of the investments, including interest and earnings, purchased with the land-acquisition funds.

Second, Plaintiffs base this argument on their belief that PL 602, by omission, does not restrict the use of the earnings on land-acquisition funds to land acquisition, and therefore purchases with earnings only do not qualify for mandatory-trust status under PL 602. Doc. 34 at 46-47 ("The fact that Congress did not include such a restriction in PL 602 demonstrates that it did not intend to restrict the use of earnings on the investment of the $100,000 set-aside funds.").[12] In support of this contention, Plaintiffs point to the Michigan Land Claims Settlement Act as an example of a statute that limited the use of earnings. *Id.* That statute was passed in 1997. Plaintiffs claim that where one statute includes language but a "related statute" omits it, that is evidence that Congress acted intentionally. *Id.* Even to the extent that general proposition is true, Plaintiffs make no attempt to demonstrate how these statutes are related, or how the inclusion of certain language in a statute 11 years after the passage of PL 602 necessarily informs on Congress's intentions in

---

[11] During the Shriner Tract litigation, which included several of the same plaintiffs as in this case, the plaintiffs, argued that the use of margin loans was actually evidence that none of the land-acquisition funds were used to purchase the Shriner Tract. *Norton*, 430 F. Supp. 2d at 1222.

[12] Plaintiffs also argue that both the May 2020 Decision and the RSM Report wrongly concluded that earnings on land acquisition funds are restricted. Doc. 34 at 48. But the statements of fact they cite in support only discuss an agency decision in the Shriner Tract litigation and Judge Robinson's decision in *Norton*. *Id.* at 24 (paragraphs 42 and 43).

passing PL 602, especially given *Norton*'s conclusion that PL 602 is silent on the issue of earnings. *Norton*, 430 F. Supp. 2d at 1218.

Further, it was established in the Shriner Tract litigation that interest <u>and earnings</u> derived from the original $100,000 <u>could</u> be used to purchase lands for purposes of the mandatory-trust provision. *Id.* at 1220-21. In *Norton*, Judge Robinson specifically considered that the objective of Congress in implementing PL 602 was to benefit the Wyandotte Nation "by funding the purchase of land to be taken into trust by the Secretary . . . with little or no interference from the Secretary." *Id.* at 1220. Judge Robinson noted that PL 602 does not "clearly prohibit use of money resulting from the investment of that amount being applied to the purchase price of any property." *Id.* at 1218 (applying the *Chevron* framework and finding that the Secretary's conclusion that earnings could be applied was based on a reasonable interpretation of the statute). She concluded that "there was nothing indicating Congress intended to preclude the addition of investment income to the original $100,000, either in the legislative history or the record of the case." *Id.* at 1220. The Secretary specifically cited and relied on several rulings from the Shriner Tract litigation in making the trust determination in the May 2020 Decision, including Judge Robinson's ruling in *Norton*. AR4485.

As explained above, the May 2020 Decision continued with the analysis that began in the Shriner Tract litigation: whether the value of the investments purchased with the land-acquisition funds were sufficient to cover the purchase of both properties. Even if the Court were to accept Plaintiffs' argument that PL 602 would not consider earnings <u>alone</u> to be land-acquisition funds, this would not demonstrate that the Secretary's decision was arbitrary and capricious because that was not the decision made. Rather, the decision was based on the holding in *Norton* that the value of the land-acquisition funds could include the interest earnings, *Norton*, 430 F. Supp. 2d at 1220-

21;[13] AR4485, and on the RSM Report's conclusion that there were sufficient funds to cover both purchases. The record adequately supports this conclusion.

### 3. Substantial evidence supports the determination that the Park City Parcel was purchased with land-acquisition funds.

Plaintiffs' third challenge of the trust determination is that the Park City Parcel was not purchased with only land-acquisition funds and is therefore not eligible for mandatory-trust status. Doc. 34 at 49-52. Many of Plaintiffs' arguments repeat the same arguments addressed above, including past representations about the purchase of the Park City Parcel and the claim that the land-acquisition funds were used to purchase the Shriner Tract. The Court has already addressed these arguments and finds they do not demonstrate the May 2020 Decision was arbitrary and capricious. Plaintiffs also point to parts of the record that they contend call into question the May 2020 Decision, including the treatment of the Park City Parcel in the Ober Audits and accounting deficiencies in the RSM Report. In support of these argument, they rely in part on the Gottlieb Affidavit.

As explained above, the Court finds that the Gottlieb Affidavit is not part of the administrative record and should not be considered. But even if the Court did consider it, the Court is not persuaded that Plaintiffs have demonstrated that the May 2020 Decision was arbitrary and capricious. As explained above, following the 2014 Denial, the Wyandotte Nation supplemented its application with a new accounting report from RSM that was based, in part, on the Ober Audits. The RSM Report was able to track the value of the total PL 602 funds overall and allocate appropriate proportions of interest growth to the land-acquisition funds. It also deducted the

---

[13] As explained above, *Norton* was vacated for jurisdictional reasons that no longer control, leaving the underlying agency decision in place. *See supra* Note 2. Beyond that procedural history, the Court discerns no overt challenge to *Norton*'s substantive rulings. To the extent any party challenges that ruling, the Court has carefully considered it and finds *Norton*'s substantive rulings to be persuasive.

interest costs associated with the margin loans—the issue highlighted by the 2014 Denial. The RSM Report concluded that, based on those calculations, there were sufficient land-acquisition funds to cover the purchase of both the Park City Parcel and the Shriner Tract. The OFM reviewed the RSM Report and found that its "methodology, calculations, and assumptions are consistent with industry standards and the RSM Report's conclusions are reliable." AR4490; *Colo. Wild*, 435 F.3d at 1213-14 (noting that courts typically defer to the "reasonable opinions" of agency experts in the face of conflicting expert reports). Based on that, the Secretary concluded that the Wyandotte Nation had sufficient land-acquisition funds to purchase the Park City Parcel in 1992 and the Shriner Tract in 1996. AR4491. The Secretary was therefore mandated to take the property into trust. AR4492; *see also See Sac & Fox Nation*, 240 F.3d at 1262.

There is substantial evidence backing up the Secretary's conclusions, and the agency articulated a satisfactory and rational explanation for its decision. *See Colo. Wild*, 435 F.3d at 1213. Given this, the Court cannot conclude that the trust determination was arbitrary and capricious. To be sure, Plaintiffs have pointed to evidence that could support a different outcome. But "the mere presence of contradictory evidence does not invalidate the Agencies' actions or decisions." *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1241 (10th Cir. 2000). As Judge Robinson concluded in *Norton*, "[t]he fact that plaintiffs harbor a difference in accounting analysis is insufficient to find the agency decision to be arbitrary and capricious, and the court will not overturn the agency's decision on this basis." *Norton*, 430 F. Supp. 2d at 1226.

Accordingly, the Court affirms the trust determination in the May 2020 Decision.

## C.    Gaming Determination

After concluding the Park City Parcel was entitled to mandatory-trust status, the May 2020 Decision determined that the Wyandotte Nation could conduct gaming on it under the "settlement

of a land claim" exception to IGRA, 25 U.S.C. § 2719(b)(1)(B)(i), as held in *Wyandotte Nation v. National Indian Gaming Commission*. AR4491. The May 2020 Decision specifically cited that case as holding "that land purchased with Land Acquisition Funds and taken in trust pursuant to [PL 602] meet criteria for [IGRA's] 'settlement of a land claim' exception, and, thus the Nation may conduct gaming on those lands." AR4485 (citing *Wyandotte Nation*, 437 F. Supp. 2d at 1211).

In *Wyandotte Nation* Judge Robinson concluded that lands purchased with land-acquisition funds were eligible for gaming under IGRA's "settlement of a land claim" exception. *See Wyandotte Nation*, 437 F. Supp. 2d at 1210.[14] Specifically, the claims paid in PL 602 were "land claims" within the meaning of IGRA. *Id.* at 1207-09. This was because the "plain meaning" of "land claim" is not limited to a claim "for the return of land, but rather, includes an assertion of an existing right to the land." *Id.* at 1208. And that definition includes the claims brought before the ICC that gave rise to PL 602. *See id.* Accordingly, Judge Robinson concluded that, because the Shriner Tract was purchased with land-acquisition funds distributed in PL 602, it qualified for IGRA's "settlement of a land claim" exception. *Id.* at 1210.

After the decision in Wyandotte Nation, the Secretary enacted regulations in 2008. The 2008 Regulations define "Land claim," *see* 25 C.F.R. § 292.2, and set forth "criteria for meeting the requirements of 25 U.S.C. [§] 2719(b)(1)(B)(i), known as the 'settlement of a land claim' exception," 25 C.F.R. § 292.5. The May 2020 Decision did not address or apply these regulations.

---

[14] As explained above, IGRA generally prohibits gaming on lands acquired in trust by the United States for the benefit of an Indian tribe after October 17, 1988. 25 U.S.C. § 2719(a). But there is an exception for lands taken into trust as part of a "settlement of a land claim." *Id.* at § 2719(b)(1)(B)(i).

1.     **The Secretary's reliance on *Wyandotte Nation* was not arbitrary and capricious as that case addressed the precise question before the agency.**

Plaintiffs argue that the 2008 Regulations control over Judge Robinson's conclusion in *Wyandotte Nation* because the court decision was not based on a finding that the full statutory language ("settlement of a land claim") was unambiguous, and that under the 2008 Regulations, PL 602 is not a "settlement of a land claim." Doc. 34 at 52-64. Thus, according to Plaintiffs, the gaming determination was arbitrary and capricious.

As a preliminary matter, Plaintiffs dedicate much of their brief arguing that the Park City Parcel would not be eligible for gaming under the 2008 Regulations. But this is not the issue currently before the Court. Rather, the issue is whether the Secretary should have <u>considered</u> the regulations in making the gaming determination instead of relying on *Wyandotte Nation*—not what that substantive outcome ought to be under those regulations. In considering this issue, the Court finds Plaintiffs' arguments unpersuasive for two reasons.

First, the Court is currently tasked with determining whether the agency's decision was arbitrary and capricious because it relied on *Wyandotte Nation* instead of the 2008 Regulations. The arbitrary-and-capricious standard generally asks "whether the agency examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made." *See Colo. Wild*, 435 F.3d at 1213. "Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure." *Utahns for Better Transp.*, 305 F.3d at 1165.

As explained above, the May 2020 Decision specifically noted that several holdings from the Shriner Tract litigation were applicable to the Park City Parcel, including *Wyandotte Nation*. The Secretary found that *Wyandotte Nation* "held that land purchased with Land Acquisition Funds

and taken in trust pursuant to [PL 602] meet the criteria for [IGRA's] 'settlement of a land claim' exception, and, thus, the Nation may conduct gaming on those lands." AR4485. Once the Secretary determined that the Park City Parcel had been purchased with land-acquisition funds (the trust determination), it followed that the Wyandotte Nation "may conduct gaming pursuant to the 'settlement of a land claim' exception to Section 2719 of IGRA . . . consistent with the Department's acquisition of the Shriner Tract as upheld by the court in 2006 in [*Wyandotte Nation*]." AR4491.

Given the unique history of this litigation, including the history of the Shriner Tract, the Court cannot conclude that this reasoning is so irrational as to be arbitrary and capricious. The Secretary was considering the exact same funds considered in *Wyandotte Nation*.[15] Indeed, had the Secretary <u>ignored</u> the *Wyandotte Nation* decision, it would likely face a challenge that the decision was arbitrary and capricious because it would have "entirely failed to consider an important aspect of the problem." *Hays Med. Ctr.*, 956 F.3d at 1263 (internal quotation and citation omitted). *Wyandotte Nation*, and indeed the Shriner Tract litigation as a whole, is certainly directly relevant to the Park City Parcel's trust application and gaming eligibility as both pieces of land were bought with the same pot of money allocated under PL 602. Reaching divergent conclusions on the gaming eligibility of each piece of land would certainly raise questions given that the agency concluded in the trust determination that the same funds were used to purchase both properties, and the eligibility for gaming turns on the source of the funds.

Second, Plaintiffs have not convinced the Court that the 2008 Regulations necessarily superseded the decision in *Wyandotte Nation* under the rule announced in *National Cable &*

---

[15]   The Court acknowledges that Plaintiffs continue to contend that the funds used to purchase the Park City Parcel were distinct from those used to purchase the Shriner Tract. As explained above, the trust determination does not support this.

*Telecommunications Association v. Brand X Internet Services.* *See Hays Med. Ctr.*, 956 F.3d at, 1264 (stating that courts "presume[s] that an agency action is valid unless the party challenging the action proves otherwise"). Agency interpretation of statutes is generally governed by *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Where statutory language is clear, the unambiguously expressed intent of Congress must control, for both courts and agencies. But if a statute is silent or ambiguous, courts will generally defer to an agency's interpretation if it is based on a permissible construction of the statute. *Sac & Fox Nation*, 240 F.3d at 1260-61. However, the Supreme Court has held that "prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). Where a court "tentatively resolves an ambiguity," that resolution is authoritative until the agency offers a definitive interpretation. *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1246 (10th Cir. 2008). But this "does not make judicial decisions subject to reversal by executive officers." *Id.*

In *United States v. Home Concrete & Supply, LLC*, the Supreme Court considered statutory language that that an earlier decision had determined was <u>not</u> "unambiguous" against a contrary and later-enacted regulation. 566 U.S. 478, 486-87 (2012). The government argued that the subsequent regulation must control under *Brand X*. But a plurality[16] of the Supreme Court disagreed, stating that "[t]here is no reason to believe that the linguistic ambiguity noted by [the prior case decided before *Chevron*] reflects a post-*Chevron* conclusion that Congress had

---

[16] Justice Scalia did not join in this portion of the decision. But in doing so he advocated that "the Court should abandon the opinion that produces these contortions, *Brand X*." *Home Concrete & Supply*, 566 U.S. at 496 (Scalia, J., concurring in part). Justice Scalia instead joined in the judgment because "it is indisputable that [the prior case] resolved the construction of the statutory language at issue here, and that construction must therefore control." *Id.*

delegated gap-filling power to the agency," in particular because the prior decision effectively demonstrated that it discerned no such gap left for the agency to fill with regulations. *Id.* at 488-90. "And there being no gap to fill, the Government's gap-filling regulation cannot change [the prior case's] interpretation of the statute." *Id.* at 490; *see also Texas v. Alabama-Coushatta Tribe of Tex.*, 918 F.3d 440, 448 (5th 2019) ("Instead of requiring the prior decision to have called the relevant statute 'unambiguous,' reviewing courts have looked for the contrary—whether the decision called the statute 'ambiguous.'").

In *Wyandotte Nation*, Judge Robinson focused on the meaning of "land claim" in the IGRA exception, finding that it was unambiguous. Plaintiffs claim that because she did not also specifically deem the word "settlement" as unambiguous, then *Wyandotte Nation*'s holding that the land-acquisition funds qualified as a "settlement of a land claim" must be set aside and the 2008 Regulations must control. But the Court disagrees that the lack of a specific determination that the word "settlement" is unambiguous renders *Wyandotte Nation* wholly overruled by the 2008 Regulations.[17] *See Texas*, 918 F.3d at 447 ("Consequently, a prior judicial decision need not say in so many magic words that its holding is the only permissible interpretation of the statute in order for that holding to be binding on an agency." (internal quotation and citation omitted)). Further, the Court discerns nothing in *Wyandotte Nation* that suggests there was any gap that needed to be filled with regulations. *See Home Concrete Supply*, 466 U.S. at 490 ("And there being no gap to fill, the Government's gap-filling regulation cannot change [the prior case's] interpretation of the statute."). Although the focus of the arguments was on the phrase "land claim,"

---

[17] Although Plaintiffs contend that a different gaming determination would result if the 2008 Regulations applied, the Court notes that it is not clear that the 2008 Regulations and *Wyandotte Nation* are even in conflict, or that application of the 2008 Regulations would necessarily result in a different outcome. But though the Court harbors some doubts about Plaintiffs' application of the 2008 Regulations to PL 602, as explained above, this is not the question currently before the Court.

nothing in *Wyandotte Nation* suggests that the overall "settlement of a land claim" exception carried any ambiguity. Certainly, had that phrase been viewed as ambiguous at all, it's unlikely that it would have gone undiscussed. Rather, Judge Robinson concluded that "the <u>plain language of section 2719(b)(1)(B)(i)</u> does not preclude the land claim brought before the ICC in this case from falling within that exception." *Wyandotte Nation*, 437 F. Supp. 2d at 1208 (emphasis added). Given these considerations, the Court cannot conclude that the Secretary's reliance on *Wyandotte Nation* was arbitrary and capricious.[18]

### 2.     Plaintiffs' attempts to distinguish *Wyandotte Nation*'s applicability to the Park City Parcel ignores the trust determination.

Plaintiffs alternatively argue that, even if *Wyandotte Nation* was not superseded by the 2008 Regulations, it is distinguishable because the Park City Parcel was not purchased with the principal of the land-acquisition funds but only with the interest thereon. Doc. 34 at 64-66. But as explained above regarding the trust determination, this is based on a premise that is not in line with what the Secretary actually found, namely that the value of the land-acquisition funds had grown enough to cover both the Park City Parcel and the Shriner Tract.

Plaintiffs also overstate the distinction drawn by *Wyandotte Nation* on the use of land-acquisition funds and the use of other funds from ordinary ICC judgments. Doc. 34 at 65-66; Doc. 41 at 30. It's clear from the context that *Wyandotte Nation* was not drawing a distinction between funds over which the Wyandotte Nation exercises any discretion (let alone suggesting that interest on the land-acquisition funds falls into this category) and funds over which it has no discretion.

---

[18]  The Court is mindful that it should only "affirm agency action, if at all, on grounds articulated by the agency itself." *Utahns for Better Transp.*, 305 F.3d at 1165. The May 2020 Decision did not specifically discuss whether the 2008 Regulations superseded *Wyandotte Nation*, and thus the Court does not affirm the gaming determination based on any conclusion to that effect. Rather, it affirms based on the Secretary's reliance on *Wyandotte Nation*, and includes the discussion of the *Brand X* rule to conclude that Plaintiffs have not demonstrated that such reliance was arbitrary and capricious.

Rather, the court was distinguishing ICC judgments awarded on "land claims" versus other judgments arising from constitutional, tort, or moral claims. *Wyandotte Nation*, 437 F. Supp. 2d at 1210 n.124. For that reason, the Court cannot find that it was arbitrary and capricious for the Secretary to not distinguish *Wyandotte Nation* as it applied to the Park City Parcel.

### 3. The Secretary's failure to address a case discussed in *Wyandotte Nation* does not demonstrate that the gaming determination was arbitrary and capricious.

Plaintiffs finally argue that the May 2020 Decision failed to address that a case cited by *Wyandotte Nation* was later vacated and, on remand, applied the 2008 Regulations.[19] Doc. 34 at 66-67. The Court finds that this does not render the May 2020 Decision arbitrary and capricious. *Wyandotte Nation*'s analysis was based primarily on the language of IGRA, which both parties contended was unambiguous. *Wyandotte Nation*, 437 F. Supp. 2d at 1207-10. Although the court also found that the underlying agency decision conflicted with another NIGC decision, this was simply additional support for the holding. The Court discerns no requirement that an agency track down all cases cited in prior judicial precedent relied upon and specifically address the procedural history of those cases.

Accordingly, the Court affirms the gaming determination in the May 2020 Decision.

## IV.    CONCLUSION

THE COURT THEREFORE ORDERS that Secretary's May 2020 Decision is AFFIRMED.

THE COURT FURTHER ORDERS that Defendant's motion to strike (Doc. 35) is GRANTED IN PART AND DENIED IN PART. The motion is granted to the extent it seeks to

---

[19]   The reversal in that case was not based on a failure to apply the 2008 Regulations in the first instance, but because the agency "engaged in a one-sentence analysis that makes an uncited reference to legislative history" and failed to account for several case-specific facts. *See Citizens Against Casino Gambling in Erie Cnty. v. Hogen*, 2008 WL 2746566, at *61 (W.D.N.Y. 2008).

strike the Gottlieb Affidavit. The Gottlieb Affidavit (Doc. 34-14) is STRICKEN. All other requests in the motion to strike are denied.

      IT IS SO ORDERED.

Dated: May 5, 2021          /s/ *Holly L. Teeter*
                                  HOLLY L. TEETER
                                  UNITED STATES DISTRICT JUDGE